J-S41003-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: B.J.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: YORK/ADAMS MENTAL | : | |
| HEALTH-INTELLECTUAL & | : | |
| DEVELOPMENTAL DISABILITIES | : | |
| PROGRAM | : | |
| | : | |
| | : | No. 932 MDA 2022 |

Appeal from the Order Entered June 13, 2022
In the Court of Common Pleas of York County Civil Division at No(s):
2022-SU-000222

BEFORE:   LAZARUS, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:        **FILED: FEBRUARY 21, 2023**

The York/Adams Mental Health-Intellectual & Developmental Disabilities Program ("MH-IDD") appeals from the order, entered in the Court of Common Pleas of York County, granting the petition to expunge records of involuntary treatment filed by Appellee, B.J.L.  Upon careful review, we vacate the order.

On July 15, 2021, B.J.L.'s daughter's boyfriend, Michael Talley, contacted crisis intervention at York Hospital from his home in Illinois to request that B.J.L. be involuntarily committed.  Talley spoke with crisis counselor Megan Fisher, whose narrative report was annexed to the petition for involuntary treatment.  Talley told Fisher that B.J.L.'s husband and daughter had gone to Missouri to care for Husband's mother, who was in hospice care suffering from dementia.  Talley reported that B.J.L. was "manic

_____

[*] Former Justice specially assigned to the Superior Court.

and escalating since being home alone[ and] feels betrayed since her family went out to help her mother-in-law." Narrative of Crisis Counselor Megan Fisher, 7/15/21. Talley stated that B.J.L. was "texting and calling multiple people" and "threatening to crash her car [into] a tree and/or burn the house down." *Id.* Talley alleged that B.J.L. bought a bottle of Jack Daniel's and "threatened to drink herself to death." *Id.* B.J.L. had allegedly threatened her daughter's life, stating if she does not do what B.J.L. says, "she's as good as dead." *Id.* Talley indicated that B.J.L. threatened her husband and daughter that "there will be hell to pay, you'll regret crossing me, you'll wish you were never born[.]" *Id.* Talley stated that B.J.L. had purchased a plane ticket to Missouri for the following day and was concerned that she would instigate a physical altercation, as she "has [a] previous history of domestic violence." *Id.* Talley advised Fisher that there were guns in B.J.L.'s residence and that B.J.L.'s 15-year-old son resided with her. *Id.* He stated that B.J.L. was "currently out driving around and [he] is concerned that she may harm herself or another motorist on the road with how erratic she has been acting." *Id.* Talley stated that B.J.L. was on her way to the AT&T store to shut everyone's phone off and had already closed the joint bank account with Husband and withdrew all of the money. *Id.*

Attached to the petition for involuntary commitment were copies of text messages sent by B.J.L. to her daughter. In one message, B.J.L. stated "[o]r better yet maybe I will burn this house down so he really doesn't have anything to come back to[]." Application for Involuntary Emergency

Examination and Treatment, 7/15/21, at 3 (Attachments to Application). In another message, B.J.L. stated "[i]f I wrap []this car around a pole he can [thank] himself." *Id.* Another string of texts read:

It doesn't matter.

With no job no nothing we will lose everything.

I will end up on the streets.

And dad and grandma will be [living] with you.

I don't even care maybe only just drop over dead because I don't seem to matter anyway.

He finally got what he wanted.

*Id.*

Finally, B.J.L. texted a photo of a bottle of Jack Daniel's whiskey and stated:

And now your dad doesn't have to worry about calling or texting me!! This will kill the pain and when I wake up he will be as much as dead to me. And [e]ven he thinks I'm kidding maybe he should as Shyrl, Jim and Betty how that working out for them.

I warned both of you the last time you went to M[issouri] and treated me like this.

*Id.*

Based on the representations contained in the application for involuntary treatment, which was completed by Crisis Counselor Fisher on Talley's behalf, a warrant was issued, directing that B.J.L. be taken to York Hospital and examined. Upon her arrival at York Hospital, B.J.L. was examined by Michael O. Khoury, D.O., who reported the results of his examination as follows:

"Suicidal ideation with a plan, burning house down[,] crashing car, homicidal ideation with a plan[.]" *Id.* at 7 (Physician's Examination). Based on his examination of B.J.L., Dr. Khoury recommended involuntary psychiatric hospitalization; B.J.L. was subsequently admitted to the psychiatric floor of York Hospital.[1] *See id.*

On February 1, 2022, B.J.L. filed a petition to expunge the records of her involuntary treatment and to restore her firearms rights pursuant to 18 Pa.C.S.A. §§ 6111.1(g)(2) and 6105(f)(1), respectively. Following a hearing, at which B.J.L. and her son testified, the trial court issued an order expunging the records of B.J.L.'s involuntary treatment and reinstating her firearms rights.[2] MH-IDD filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) statement.

MH-IDD raises the following issues for our review:

1. When there was sufficient evidence relied upon by the physician to warrant the [s]ection 302 commitment, did the [trial] court abuse its discretion in granting the petition [for expungement]?

2. When B.J.L. did not contest the validity of the signature on the warrant, thereby waiving any objection in relation thereto, and

---

[1] On the day of her admission, K.J.L. was examined by another doctor, who subsequently ordered her immediate release. However, K.J.L.'s swift discharge was not a factor to be considered either by the trial court or by this Court on appeal. *See In re Vencil*, 152 A.3d 235, 241 (Pa. 2017) (trial court's review of sufficiency of evidence supporting 302 commitment limited to information available to physician at the time decision to commit made).

[2] MH-IDD does not appeal the court's determination with respect to B.J.L's firearms rights under section 6105(f)(1). *See* Brief of Appellant, at 6.

- 4 -

when there was no evidence presented otherwise to suggest the warrant's signature was invalid, did the [trial] court abuse its discretion in granting the [p]etition [for expungement]?[3]

Brief of Appellant, at 4.

"Our well-settled standard of review in cases involving a motion for expunction is whether the trial court abused its discretion." ***Commonwealth v. Smerconish***, 112 A.3d 1260, 1263 (Pa. Super. 2015). To the extent that questions exist concerning the sufficiency of the evidence supporting B.J.L.'s commitment, our standard of review is *de novo* and our scope of review is plenary. ***In re Vencil***, 152 A.3d at 241.

B.J.L. challenges the sufficiency of the evidence supporting her involuntary commitment. Pursuant to the Mental Health Procedures Act ("MHPA"),[4] a person for whom there are "reasonable grounds to believe" that she is "severely mentally disabled and in need of immediate treatment" may be subjected to an involuntary examination by a physician. 50 P.S. § 7302(a). When an individual is brought in for an examination and determination of her

---

[3] Here, the court *sua sponte* concluded that the warrant was "faulty" because it did not bear the signature of the county administrator, Sharon Harlacher, as required by 50 P.S. 7302(a). Rather, the warrant appears to have been executed by an unknown individual on behalf of Administrator Harlacher. However, B.J.L. did not challenge the validity of the warrant on this basis in her petition to expunge. Where a trial court relies upon issues raised *sua sponte* in granting relief, it inappropriately impinges upon the role of the litigants. ***See, e.g.***, ***Commonwealth v. Nelson***, 690 A.2d 728, 730 (Pa. Super. 1997). Accordingly, to the extent that the trial court based its determination on the validity of the warrant, it erred. However, the court went on to address the sufficiency of the evidence, and we will review that determination on its own merits.

[4] 50 P.S. §§ 7101-7503.

need for emergency mental health treatment, the physician must determine, within two hours of the individual's arrival, whether the person is in fact "severely mentally disabled" and "in need of immediate treatment." *Id.* at § 7302(b).

An individual is "severely mentally disabled" if, "as a result of mental illness, [her] capacity to exercise self-control, judgment and discretion in the conduct of [her] affairs and social relations or to care for [her] own personal needs is so lessened that [she] poses a clear and present danger of harm to others or to h[er]self." *Id.* at § 7301(a). What constitutes a "clear and present danger" is defined, in relevant part, by section 301 of the MHPA:

> (1) Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated. . . .
>
> (2) Clear and present danger to h[er]self shall be shown by establishing that within the past 30 days:
>
> * * *
>
> (ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide[.]

*Id.* at § 7301(b). If the examining physician determines that the person is "severely mentally disabled and in need of immediate treatment, treatment

shall be begun immediately" and continue until "there is no longer a need for immediate treatment," up to 120 hours. *Id.* at §§ 7302(b), (d).

The Uniform Firearms Act ("UFA") prohibits a person who has been involuntarily committed for psychiatric treatment under section 302 from possessing, using, controlling, selling, transferring, manufacturing, or obtaining a license to possess a firearm. *See* 18 Pa.C.S.A. § 6105(c)(4). Section 6111.1(g)(2) of the UFA provides one avenue to lift the firearm restrictions that result from a 302 commitment, providing, in relevant part, as follows:

> A person who is involuntarily committed pursuant to section 302 of the [MHPA] may petition the court to review the sufficiency of the evidence upon which the commitment was based. If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged.

*Id.* at § 6111.1(g)(2) (footnote omitted). "The evidence upon which the commitment was based" is the information contained in the physician's record of the examination of the individual and the resultant findings." *In re Vencil*, 152 A.3d at 242.

> In a proceeding under section 6111.1(g)(2),
>
> the appropriate standard of proof applicable to the physician's record findings is a preponderance of the evidence standard, which is generally applicable to civil matters and has been classified as "a more likely than not inquiry," supported by the greater weight of the evidence; something a reasonable person would accept as sufficient to support a decision.

*Id.* at 246.

Here, MH-IDD argues that the information included in the application for commitment, as detailed *supra*, as well as the findings of Dr. Khoury following his examination, were sufficient to support B.J.L.'s involuntary commitment. We are constrained to agree.

The application for commitment submitted by MH-IDD asserted that B.J.L. was severely mentally disabled and posed a clear and present danger to others, pursuant to section 7301(b)(1), and was a suicide risk, pursuant to section 7301(b)(2)(ii). Both subsections of the MHPA require that the individual has taken "acts in furtherance of the threat." 50 P.S. §§ 7301(b)(1), (2)(ii). While B.J.L. argues that she committed no "acts in furtherance," this Court has repeatedly held that "engaging in the planning process constitutes an act in furtherance of the threat to commit suicide." *In re B.W.*, 250 A.3d 1163, 1175 (Pa. 2021). While the record is scant regarding the specific information gleaned by Dr. Khoury in his examination of B.J.L., his written findings indicate that B.J.L. expressed suicidal ideation "with a plan," which included burning down her house and crashing her car. Although B.J.L. subsequently denied at the hearing on her petition for expungement that she had been suicidal, consideration of that testimony was beyond the scope of the trial court's review. *See In re Vencil*, *supra* (sufficiency review of evidence supporting 302 commitment limited to information available to physician at time of decision to commit). Moreover, the information provided to Crisis Counselor Fisher by Talley, as well as the text messages from B.J.L., are consistent with Dr. Khoury's conclusions following his examination.

Accordingly, evaluated under the proper standard and scope of review, the evidence was sufficient to support B.J.L.'s involuntary commitment. As such, the trial court erred in granting her petition for expungement under section 6111.1(g)(2).

Order granting expungement of involuntary treatment records vacated. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/21/2023